**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:21-cr-00118-TWP-DML-1 |
| | ) | |
| ARTHUR MILES, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT'S MOTION TO SUPPRESS**

This matter is before the Court on Defendant Arthur Miles' ("Miles") Motion to Suppress

Evidence (Filing No. 44).  Miles is charged by Indictment with Count 1: Possession with the Intent

to Distribute Controlled Substances, and Count 2: Commission of Federal Felony While on Pretrial

Release. (Filing No. 16.)  He seeks suppression the search of his automobile and all evidence

recovered pursuant to the suppressed search, which he argues violated his Fourth Amendment

rights.  For the following reasons, the Motion is **denied**.

**I.     FINDINGS OF FACT**

Although Miles disputes the credibility of Officer David Craig's ("Officer Craig")

testimony, neither party has requested a hearing and the Court determines a hearing is not

necessary. The Court is able to make necessary credibility determinations based on the evidence

presented by the parties in their pleadings.[1]  That evidence consists of Officer Craig's testimony

under oath at the probable cause hearing where he was cross-examined by Miles' attorney (Filing

No. 44-2), and two affidavits that Officer Craig has provided. (Filing No. 44-3, Filing No. 51-1).

---

[1] A hearing is not necessary on a motion to suppress unless " there are disputed issues of material fact which will affect the outcome of the motion.'" *United States v. Juarez*, 454 F.3d 717, 719–20 (7th Cir. 2006) After reviewing the parties' briefs and exhibits in support thereof, the Court determines that it can resolve any perceived disputes by viewing the parties evidentiary exhibits.

On July 30, 2020, at approximately 4:30 p.m., Miles was traveling eastbound near the intersection of 38th Street and Capital Avenue in Indianapolis, Indiana, in a blue Hyundai Elantra bearing a West Virginia license plate.  Around the same time, Officer Craig, an officer with the Indianapolis Metropolitan Police Department ("IMPD") was part of a "hot spot" detail "looking for and patrolling high crime areas".  (Filing No. 44-2 at 7.)  Officer Craig's duty that day was to patrol and monitor traffic in that area of 38th Street "for narcotics and firearms, etc."  *Id*.  Officer Craig was parked near 38th Street and Capital Avenue in his fully marked patrol car when he observed the blue Hyundai Elantra driving eastbound on 38th Street.  The driver was wearing a baseball hat and as the vehicle drove past, the bill attached kept moving up and down.  *Id*.  Officer Craig assumed the driver was looking in his mirror to see if Officer Craig was following him, and it appeared to Officer Craig that the driver was nervous about the officer's presence.  *Id*.

Officer Craig then pulled out of his parking spot and onto 38th Street to begin following Miles and noticed that the vehicle had an out-of-state license plate.  There was at least one car between them.  Miles pulled into the BP gas station located at 38th and Illinois Street, (37 W. 38th Street), and Officer Craig pulled into the Burger King Restaurant parking lot near the gas station. Five to ten minutes later, when Miles exited the gas station he entered onto Salem Street, and Officer Craig observed that Miles "blowed [sic] through a stop sign" and turned eastbound onto 38th  Street.  *Id*. at 8.  Officer Craig did not initiate a traffic stop because it would have been "an awkward stop because [Miles] had already pulled out onto 38th Street, and [Officer Craig] was on Salem." (Filing No. 44-2 at 23-24.)

As Miles traveled down 38th Street near the intersection of Meridian Street, Officer Craig observed Miles briefly signal for approximately "one car length" before turning into a strip mall. *Id*. at 8.  Officer Craig considered this to be "unsafe, considering the amount of traffic on 38th

Street." *Id*.  Because Miles did not signal for at least 200 feet before turning, Officer Craig initiated

a traffic stop and Miles pulled over.  Officer Craig approached the vehicle, and "immediately upon

contact" could smell the odor of marijuana which he knows from his training and experience as a

patrol officer.  (Filing No. 44-3.)  Officer Craig asked Miles if there was anything in the car that

should not be, and Miles responded "I just smoke weed."  *Id*.  Miles also informed Craig that the

vehicle was not his but, rather, a rental because his vehicle was in the shop.  IMPD Officer Kari

Pennington arrived on scene and Miles was removed from the vehicle and patted down.  Marijuana

was discovered on Miles' person in a sealed plastic bag.  Officer Craig then conducted a probable

cause search of the vehicle based upon the odor of marijuana.  During the search, officers located

a bag containing 18 grams of suspected methamphetamine inside a can designed with a false

compartment, digital scales with white residue, and five empty baggies in the vehicle, and $524.00

in United States Currency in Miles' right pocket.  *Id*. at 1, 2.  Miles was placed under arrest.  He

filed his Motion to Suppress Evidence on November 15, 2021.  (Filing No. 44.)

## II.   CONCLUSIONS OF LAW

Miles contends that there was no probable cause to stop and later search his vehicle, and

therefore, the officers' actions were in violation of the Fourth Amendment to the United States

Constitution.  Specifically, he argues (1) it was impossible for him to comply with Indiana's turn

signal statute and the officer could not have witnessed him "blow" the stop sign; and (2) probable

cause did not exist to search his vehicle during the traffic stop.

The Fourth Amendment guarantees "the right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.

Because a traffic stop constitutes a "seizure" under the Fourth Amendment, it is "subject to the

constitutional imperative that it not be 'unreasonable' under the circumstances."  *Whren v. United*

*States, 517 U.S. 806, 810* (1996). The court in *Whren* explained "[a]s a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.*, *also, see United States v. Jackson*, 962 F.3d 353, 357 (7th Cir. 2020) (reasonable suspicion of a traffic violation provides a sufficient basis to justify a traffic stop). "The government bears the burden of proving by a preponderance of the evidence that reasonable suspicion supported the traffic stop." *Id.*

"Warrantless searches are considered *per se* unreasonable under the Fourth Amendment unless one of a few specifically established and well-delineated exceptions applies." *United States v. Williams*, 627 F.3d 247, 251 (7th Cir. 2010) (citing *Arizona v. Gant*, 556 U.S. 332 (2009)).  One of those exceptions is the automobile exception, "which allows law enforcement to conduct a warrantless search of a vehicle if there is probable cause to believe the vehicle contains contraband or evidence of a crime." *Id.*  When there is probable cause to search a vehicle, law enforcement may search "all parts of the vehicle in which contraband or evidence could be concealed, including closed compartments, containers, packages, and trunks." *Id.* (citing *United States v. Scott*, 516 F.3d 587, 589 (7th Cir. 2008); *United States v. Ross*, 456 U.S. 798, 823–24 (1982).  When searching a vehicle, "an individual's expectation of privacy in a vehicle and its contents may not survive if probable cause is given to believe that the vehicle is transporting contraband." *Ross*, 456 U.S. at 823.  "The probable cause determination must be based on objective facts that could justify the issuance of a warrant by a magistrate and not merely on the subjective good faith of the police officers." *Id.* at 808.

## A.     Validity of the Traffic Stop

Miles first contends that compliance with the turn-signal statute was not possible for two reasons. First, Miles asserts he turned right into the strip mall immediately after crossing the

intersection of 38th Street and Meridian and because there was not 200 feet after the intersection he was unable to comply with the applicable statute as there was only enough room to signal for a car length—which Miles did.  And second, if he had signaled prior to entering the intersection, it would have been confusing to other motorists and would have created a danger.  Miles also contends that it is incredulous and against common sense that Officer Craig's vantage point (the parking lot of the Burger King with at least two buildings between him and Miles) allowed him to view Miles "blow" through the stop sign on Salem.  (Filing No. 44 at 10.)

In response, the Government argues that Miles committed two traffic infractions, both of which independently provide probable cause for the traffic stop.  Concerning Miles' failure to stop at a stop sign, the Government points to Officer Craig's testimony[2] and argues that Officer Craig had an unobstructed view of the intersection between Salem and 38th Street, allowing him to clearly observe Miles' failure to stop at the stop sign.  Concerning Miles' failure to signal,  the Government argues that more than 200 feet existed between when Miles turned onto 38th Street and then turned after Meridian.

Ind. Code § 9-21-8-25 provides: A signal of intention to turn right or left shall be given continuously during not less than the last two hundred (200) feet traveled by a vehicle before turning or changing lanes.  Ind. Code § 9-21-8-32 provides:  A person who drives a vehicle shall stop at an intersection where a stop sign is erected at one (1) or more entrances to a through

---

[2] At the probable cause hearing, Officer Craig testified:

> Shortly after he went back and started his vehicle, exited the gas station out onto Salem. I drove through the parking lot of the gas station, which is connected to a McDonald's. So he went from the gas station to McDonald's, down the street. When I was exiting out onto Salem from McDonald's, he blowed [sic] through a stop sign on Salem, driving out onto 38th Street, and then, that is when I continued to follow him.

(Filing No. 44-2 at 8, lines 4-12).  Miles presented photographs of the area in support of his argument that Officer Craig's view was likely obstructed, but the Court finds Officer Craig's testimony to be credible.

highway that are not a part of the through highway and proceed cautiously, yielding to vehicles that are not required to stop.  Here, Officer Craig testified that he witnessed Miles commit two traffic infractions. "An officer has probable cause for a traffic stop when she has an 'objectively reasonable' basis to believe a traffic law has been violated." *United States v. Dowthard*, 500 F.3d 567, 569 (7th Cir. 2007).  If an officer reasonably thinks he sees a driver commit a traffic infraction, that is sufficient basis to pull him over without violating the Constitution. *United States v. Simon*, 937 F.3d 820, 829 (7th Cir. 2019).  Because traffic stops are typically brief detentions, more akin to *Terry* stops than formal arrests, they require only reasonable suspicion of a traffic violation— not probable cause. *United States v. Cole*, __F.4th__, 2021 WL 5984977 at *11 (7th Cir. December 17, 2021) (citing to *Navarette v. California*, 572 U.S. 393, 396–97, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014); see also *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

The evidence before the Court supports Officer Craig's objective belief that he had reasonable suspicion—as well as probable cause—to stop Miles because Miles only signaled for 100 feet before turning into the strip mall.  The Government has presented satellite imaging and map calculations which show the length of the city block that Miles drove on 38th Street is approximately 315 feet, not including the distance he drove after Meridian before he turned.  (Filing No. 51 at 7.)  This evidence substantiates Officer Craig's version of the events.  Indeed, Miles concedes that he only signaled for one car length but asserts that "he could not have signaled 200 feet without creating confusion.… and possibly a hazard to other drivers—especially considering that this stop occurred during rush hour and there was 'quite a bit of traffic.'"  (Filing No. 54 at 10.)  But Officer Craig is a patrol officer who has been in law enforcement since June 2017 and he is familiar with Indiana's traffic laws.  If an officer reasonably thinks he sees a driver commit a traffic infraction, that is a sufficient basis to pull him over without violating the

Constitution.  Police can stop an automobile when they have probable cause to believe that the driver violated even a minor traffic law.  *United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005); *see also United States v. Simon*, 937 F.3d 820, 829 (7th Cir. 2019).  Officer Craig's determination that Miles' failure to signal more than 200 feet created an unsafe situation for other vehicles is reasonable and justifies the traffic stop.[3]

**B.**     **Probable Cause to Search the Vehicle**

Having determined that the stop was lawful, the Court next determines whether probable cause existed to search Miles' vehicle.  Whether Officer Craig had probable cause to search Miles' vehicle depends on whether he smelled burnt or raw marijuana.  *See*, *United States v. Franklin*, 547 F.3d 726, 733 (7th Cir. 2008) ("A police officer who smells burning marijuana coming from a car has probable cause to search that car.").  *See also, United States v. Mosby*, 541 F.3d 764, 768-69 (7th Cir. 2008) (citing cases); *United States v. Cherisme*, 854 Fed.Appx. 447, 447-48 (3d Cir. 2021); *United States v. Johnson*, 445 F. App'x 311, 312 (11th Cir. 2011); *United States v. Bettis*, 946 F.3d 1024, 1026 (8th Cir. 2020).  Miles points out that "the arrest narrative does not indicate whether the officer smelled burning or raw marijuana, however, no burning marijuana was recovered during the search", ([Filing No. 44 at 11](#)), and only a small baggie of marijuana was recovered from Miles' pocket. *Id*. at 12. Miles argues the "officer's assertion that he smelled the tiny amount of raw marijuana in a baggie, in Mr. Miles' pocket, supports a finding of incredibility as a matter of law." *Id*.

The Court is not persuaded.  Officer Craig testified that he smelled the odor of marijuana after he approached the vehicle and made contact with Miles.  While the record is not clear as to

---

[3] The Court also finds credible Officer Craig's testimony that his view was unobstructed and that he observed Miles' fail to stop at the stop sign on Salem Street.  However, because the traffic stop was effectuated because of the turn signal violation, the Court need not expound on this evidence.

whether Officer Craig smelled the odor of burnt or unburnt marijuana, that distinction is unnecessary to support the finding of probable cause, especially here where probable cause is not based solely on the odor.  After smelling the odor of marijuana, Officer Craig asked Miles if there was anything in the car there should not be there, to which Miles replied "I just smoke weed." (Filing No. 44-3.)   Miles does not dispute this evidence.  This statement provides more than sufficient probable cause that the odor Officer Craig smelled was marijuana, and that Officer Craig could search the vehicle.  Accordingly, suppression is not warranted on this basis.

**C.**     **Reasonableness of the observation and stop of Miles**

Finally, the Court will address Miles' assertion that the observation and stop of his vehicle were unreasonable and in violation of the Fourth Amendment.  (Filing No. 54 at 1.)  In his reply brief, Miles asserts that Officer Craig profiled him because he is Black, and that the stop was pretext.  In particular, he contends that:

> Craig testified that because Mr. Miles—a black male—appeared to be checking his rear-view mirror, Craig believed Mr. Miles was nervous about the officer's presence. *Id*. Because of that, Craig decided to follow Mr. Miles to the gas station and observe him until, ultimately, he had a "lawful" reason to initiate a traffic stop.

*Id*. at 3.  He argues,

> Based on only the observation that Mr. Miles had checked his rearview mirror, it was unreasonable for Craig to pull into the Burger King lot to observe Mr. Miles at the BP gas station located at the corner of West 38th Street and Illinois Street in Indianapolis. When Craig did not observe any further suspicious behavior from Mr. Miles while he was pumping gas at the BP, it became even more unreasonable to follow Mr. Miles when he left the gas station.

*Id*. at 5.  Quoting *United State v. Cole*, Miles argues the "discretion afforded to police officers leads to tactics that subject large numbers of innocent drivers to harassment and humiliation for minimal gains in drug interdiction". *Cole* at *11.   *Id*. at 3.  He contends "[b]ecause of this discretion, defendants that allegedly violate minor traffic laws are left without recourse and

without protection from the Fourth Amendment." *Id*. at 2. Miles concludes that it was unreasonable for Officer Craig to follow him until he ultimately obtained a "legal" reason to pull him over, and the Fourth Amendment demands more.

The Court first notes that "if there was probable cause to make the stop, and if the stopping officer was acting with authority, the stop was not pretextual. 'So long as the police are doing no more than they are legally permitted and objectively authorized to do, an arrest is constitutional.'" *United States v. Trigg*, 878 F.2d 1037, 1041 (7th Cir. 1989). Additionally, the Fourth Amendment permits pretextual traffic stops as long as they are based on an observed violation of a traffic law. *Whren* at 810.

Under the circumstances here, the Court does not find Officer Craig's actions to be unreasonable or in violation of the Fourth Amendment. Contrary to Miles' assertion, at no time did Officer Craig state that "Miles—*a black male*—appeared to be checking his rear-view mirror" as a reason why Miles was brought to his attention. (Filing No. 54 at 3 (emphasis added).) Instead, Officer Craig testified that Miles appeared nervous concerning his presence and appeared to be checking his rear-view mirror to see if he was going to follow him. The officer's observation that Miles appeared nervous is not unreasonable, and this testimony is credible. After all, Miles is alleged to have been on federal pretrial supervision for pending charges of possession with the intent to distribute methamphetamine, possession with the intent to distribute cocaine, and possession of a firearm by a convicted felon in Case No. 1:19-cr-00183-TWP-DML, and allegedly had marijuana, methamphetamine and scales in his vehicle. It is not incredible to believe that Miles seemed nervous. Moreover, nervousness is a factor that can support reasonable suspicion. *See United States v. Rodriguez-Escalera*, 884 F.3d 661, 669 (7th Cir. 2018).

On the date of the arrest, Officer Craig "was part of the hot spot detail, so [he was] looking for patrolling high crime areas. The University of Phoenix has designated certain hot spots for the city. So [his] duty that day was to patrol that specific area for narcotics and firearms, etc." (Filing No. 44-2 at 7.)  The Seventh Circuit has recently referred to "hot spots" while addressing Fourth Amendment challenges. The Seventh Circuit considers "hot spot" policing to be just another factor to consider in a totality of the circumstances analysis of the Fourth Amendment regarding traffic stops. *See United States v. Johnson*, 874 F.3d 571 (2017); *United States v. Mays*, 819 F.3d 951 (2016).  In *Mays*, officers were on patrol in "a 'problem area or a hot spot'" where a hot spot was defined as an area with a "high number of 'dispatched runs [to the area] that may involve violent crimes, robberies, narcotic investigations.'" *Mays*, at 953.  During this patrol, the officer saw a fight happening and Mays appeared to be watching the fight. *Id*. As the officer approached the individuals who were fighting, Mays began to walk away and obscenely refused the officer's requests to stop walking away. *See id*. at 953-54. As a result, another officer who was called to the scene began to follow Mays to get him to stop. *Id*. at 954.  Mays continued to refuse to stop so the officer placed his hand on Mays to prevent him from turning around when the officer spotted a gun in Mays hand and proceeded to taser him. *Id*. Mays, after arrest and indictment, filed a motion to suppress the firearm arguing that the discovery of the gun was the result of "an illegal seizure." *Id*. The court held that there was no Fourth Amendment violation.  In relation to the "hot spot" issue, the court found that "[o]fficer Lepsky also knew that the fight had taken place in a high-crime area. Although this fact alone 'cannot, in and of itself, support a particularized suspicion . . . an officer is permitted to consider a location's characteristics when assessing a situation.'" *Id*. at 958 (quoting *United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010)).

The area of Miles' traffic stop is indeed a hot spot.[4]  The Court recognizes that "hot spot" policing is a polarizing subject, particularly in communities of color.  However, the goal of hot spot policing is to improve public safety.  People who live in high crime areas want their community to be safe and crime free.  According to the National Institute of Justice, the strategy of hot spot policing involves the targeting of resources and activities to those places where crime is most concentrated.[5]  Focusing resources and activities in hot spots aims to prevent crime in these specific areas and potentially, reduce overall crime levels in the wider geographic area.

The Court does not disagree with Miles' assertion that "[e]mpirical studies based on millions of traffic stops show:… that police departments have exploited *Whren*;… [and] that Black and Hispanic drivers are subjected to such stops and ensuing searches at substantially higher rates than white drivers."  (Filing No. 54 at 3.)  However here, there is no evidence that Miles' race was a factor.  In his dissent in *Johnson*, Judge Hamilton discussed that police officers have the broad discretion to impose severe intrusions on the privacy and freedom of civilians going about their

---

[4] Feb 13, 2020 / 01:09 AM EST / Updated: Feb 13, 2020 / 01:52 PM EST INDIANAPOLIS (WISH) — A near north side representative called for a crackdown on crime along the 38th Street corridor, between Capitol Avenue and Meridian Street, weeks after a News 8 report highlighted a string of incidents at an area McDonald's. The restaurant, located at 37 West 38th Street, shares a facility with a BP gas station convenience store.  Drivers and restaurant regulars described shootings, stabbings, fights and an attack on the McDonald's franchise owner near 38th and Illinois streets.  "Annually, there are hundreds of [police] runs to this area," city-county council member John Barth said Sunday night in a Tweet. "Historically, many runs have been attributed to the BP/McDonald's." https://www.wishtv.com/news/crime-watch-8/council-member-calls-38th-street-corridor-scene-of-mcdonalds-attack-hot-spot-of-violent-crime/

November 21, 2021, Officers were called to 38th and Meridian streets around 8 p.m. on a report of a person shot. Police found 30-year-old Carlos Hale Jr. with apparent gunshot wounds inside a vehicle that was parked near a business off of East 38th Street. Medics pronounced Hale dead at the scene. https://www.indystar.com/story/news/crime/2021/11/

May 2021, Man dead, woman stable after shooting at party near 38th and Meridian https://www.wishtv.com/news/crime-watch-8/1-dead...

[5] The National Institute of Justice (NIJ) is the research, development, and evaluation agency of the United States Department of Justice. The NIJ's mission is to advance scientific research, development, and evaluation to enhance the administration of justice and public safety.  *See*  https://crimesolutions.ojp.gov/ratedpractices/ 8#:~:text=Hot%20spots%20policing%20strategies%20focus,is%20most%20likely%20to%20occur.

business and there is a legitimate concern for possible overreach by law enforcement officers. [6] *Johnson* at 576.  Indeed, this form of policing places a heavy burden on officers to utilize their discretion professionally, respectfully, and constitutionally and to have a reasonable basis for their stop, search and seizure. There is no evidence to show that Officer Craig did not do so here.  The fact that the area where Miles was observed and stopped was a "hot spot" in conjunction with the other factors was enough to justify Officer Craig's decision to follow Miles' vehicle, and stop him after witnessing traffic violations.

### III.  CONCLUSION

A review of the totality of the circumstances reveals that Officer Craig's stop and subsequent search of Miles' person and vehicle were reasonable and constitutional.  For the reasons explained above, the Court **DENIES** Miles' Motion to Suppress Evidence (Filing No. 44).

**SO ORDERED.**

Date:  1/26/2022

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Finis Tatum, IV
TATUM LAW GROUP, LLC
ftatum@tlgindy.com

Pamela S. Domash
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
pamela.domash@usdoj.gov

---

[6] In *Johnson*, five officers in two police cars stopped a car for a suspected parking violation.  In his dissent, Judge Hamilton stated "[t]here are two distinct grounds for reversal here. The first is that the doctrines allowing pretextual traffic stops under the combination of *Terry* and *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), should not be extended to mere parking violations. The second and narrower ground is that even if such an extension might be available in theory, the police did not have a reasonable basis for this particular seizure." *United States v. Johnson*, 874 F.3d 571 (2017).